THE STATE v. NELSON JOHNSON, Appellant.—163 S. W. (2d) 780.

Division Two, June 17, 1942.

Rehearing Denied, July 28, 1942.

*Herman Pufahl, Chas. H. Green, Jr.,* and *Haysler A. Poague* for appellant.

912

*Roy McKittrick, Attorney General,* and *Olliver W. Nolen,* Assistant Attorney General, for respondent.

914

WESTHUES, C.—Appellant was charged by an information filed in the circuit court of St. Clair county, Missouri, with the crime of murder in the first degree. A change of venue was taken and the case was sent to Henry county, Missouri, where it was tried. Appellant was convicted of murder in the second degree and sentenced to imprisonment in the penitentiary for a term of twenty years. He appealed.

The sufficiency of the evidence to sustain the conviction was not questioned. The points relied upon for a reversal pertain to the admission of evidence, instructions given and statements made by the prosecuting attorney in his argument to the jury. The State's evidence supports the following narration of facts. Appellant was about thirty-four years of age and the deceased, Carl Gresham, was over fifty years of age. Both were married and lived with their families on farms a few miles southwest of Roscoe, Missouri, near highway number 82. Appellant's farm was located beyond that of the deceased. Ill-feeling had existed between the men for a number of years. This feeling was engendered through disputes with reference to school matters. Appellant's wife had taught two terms at the

district school. The deceased had voiced his objections to her as a teacher, which was the immediate cause of the ill-feeling existing between the men. The record contains substantial evidence that appellant had made threatening remarks with reference to the deceased and deceased had made threatening remarks with reference to appellant. These threats were communicated to appellant and deceased by their would-be friends. The homicide, to which there were no eyewitnesses, occurred near 7:00 o'clock on the evening of June 4, 1940, about one mile or so southwest of Roscoe. Appellant and deceased were on their way home at the time, each driving his own car. On this evening appellant, after he had finished his work, had driven to Osceola, Missouri, and on his return had stopped at Roscoe. At about 5:30 P. M., while appellant was in a store talking to the owner, one Goodrich, and another, the deceased joined in the conversation. Appellant asked him if he wanted a bottle of beer and deceased replied that he had just had two bottles and cared for no more. In a short time deceased stated that he was going to leave and appellant asked him if he were going to stop at the corner. Deceased answered in the affirmative and appellant stated he would be up in a few minutes. The place referred to was a filling station and restaurant where beer could be purchased. Forrest Goodrich testified that after the deceased left the store appellant winked at him and said: "I want to see the s—of-a-b—;" that appellant then asked him if he had some number thirty-eight cartridges, and when informed he didn't, appellant stated: "I have got them," then he inquired whether Gresham had paid his school tuition; that appellant then left the store building and drove away in his car. Two witnesses testified that after appellant entered the car he placed some cartridges in a revolver. Appellant explained this by stating his car keys had become entangled with the revolver and one of the cartridges had fallen out and he had replaced it. Appellant denied making the derogatory remark about the deceased while in the Goodrich store. The next place appellant and deceased met was at the corner restaurant. A witness testified that he saw a gun in appellant's pocket, and that while in the restaurant appellant as well as deceased ordered a bottle of beer. There was evidence that the deceased offered to pay for the beer, whereupon appellant stated: "Your s—of-a-b— money isn't worth a G— D—;" that deceased made no reply. This evidence was given by two or more witnesses. It was then about 7:00 P. M. The deceased left the restaurant and started for home and appellant followed. A witness living near the road saw them pass, appellant in the lead and deceased following within a short distance. Another witness saw them a little later and at that time the deceased was in the lead and appellant was following. Later, at the point of the homicide, two witnesses, driving a truck and a car respectively, saw the cars parked by the side of the road, the de-

ceased's car about one hundred feet or so ahead of appellant's. These witnesses testified that appellant was sitting in his car and deceased was standing close by talking to him. The truck driver stated that just as he passed the cars he heard what he thought to be back-fire of his motor, but paid no further attention to the matter. Other witnesses testified that they heard two shots about that time. The State also introduced evidence tending to prove that appellant was intoxicated and seemed to be angry the evening of the homicide and that the deceased was in a good humor. Appellant relied upon self-defense. He admitted that he shot the deceased twice, whereupon deceased stumbled across the roadway and fell. Deceased was later picked up by the coroner and taken to the hospital where he died the next morning. No weapons, except a small pocket-knife, were found on deceased. Appellant testified that the deceased passed him on the road and signaled him to stop; that he did so and deceased came to his car and began to talk about the troubles they had had; (of which there seemed to have been plenty); that deceased argued with him over these matters until the truck came by. What occurred thereafter, as per appellant's evidence, may be best observed by quoting his evidence. It reads as follows:

"Q. Well now then, when the truck came by, what happened? A. He walked around in front of my car. He waved at this truck man as he went by. Just as he got even with him, he reached to the ground and grabbed something and lunged to my car, pulled the door open and grabbed me by the left arm with his left hand.

"Q. What did he try to do or attempt to do? A. He says, 'Here is where I kill you, you s—of-a-b—.'

"Q. What did you do? A. As he pulled the door open and said that, I grabbed the pistol out of my pocket as quick as I could and shot him twice.

"Q. Why did you shoot him? A. Because he had threatened me, told me he was going to kill me.

"Q. Did you think that he was going to do it? A. I absolutely did."

 Appellant asserts that the information was not properly signed by the prosecuting attorney. The record shows that it was signed and sworn to by John M. Belisle. He was not referred to or described as the prosecuting attorney in the jurat, however, in the information itself we find the following which we deem sufficient to show that the information was in fact signed by the prosecuting attorney of the county. It reads in part:

"Comes now John M. Belisle, duly elected, qualified and acting Prosecuting Attorney within and for St. Clair County, Missouri, and being first duly sworn upon his oath of office states . . ."

We deem the information sufficient.

 Appellant next insists the trial court erred in permitting the State to endorse the names of thirteen additional witnesses on

the information on the morning of the trial, because appellant had had only one day's notice of the State's intention to do so; also that the court erred in not thereafter granting a continuance. If there was any merit in appellant's contention it passed out of the case during the trial for the reason that not one of these witnesses was called by the State in presenting its case in chief and only one was called in rebuttal. It is evident that appellant was not prejudiced.

The State was permitted, over appellant's objection, to introduce evidence tending to show appellant was intoxicated on the evening of the homicide. This was assigned as error. Among the cases cited by appellant in support of this contention is, State v. Todd, 342 Mo. 601, 116 S. W. (2d) 113, 1. c. 116, 117 (8). That case is authority against appellant's contention. It was there expressly ruled that such evidence was competent for the consideration of the jury. In the present case we think it was material and competent on the question of determining whether appellant or the deceased was the aggressor. In the Todd case, this court quoted the following from a Georgia case:

" 'the testimony that the accused was drinking at the time of the alleged assault was admissible for the purpose of showing a condition of mind which might have rendered him reckless of consequences.' "

The point must be ruled against appellant. We also rule that the State was properly permitted to show the deceased remained in a good humor and made no reply when at the restaurant appellant informed him in vulgar language that his money was not good enough to pay for the beer.

The ill-feeling between appellant and the deceased had existed for a number of years and continued up to the time of the homicide. The State introduced evidence of threats made by appellant at various times during that period. The defense offered evidence of threats made by the deceased. Appellant asserts that threats alleged to have been made in 1938 were too remote and should not have been admitted in evidence. Since those threats grew out of the school difficulty over which the ill-feeling arose and existed, the evidence was proper and not too remote or disconnected. [State v. Shawley, 334 Mo. 352, 67 S. W. (2d) 74, 1. c. 86 (22); State v. Bowenkamp, 39 S. W. (2d) 753, 1. c. 754 (2).]

A witness by the name of Hendrickson testified for the State. On cross-examination he admitted that he had been convicted of driving a car while intoxicated. On re-direct examination he was asked the following question:

"Q. Mr. Hendrickson: You never had gotten in trouble except when you were drinking, is that right? A. That is right."

Then followed an objection by appellant which was overruled. The ruling was assigned as error. The objection, even if it had merit, came too late, as no motion to strike the answer was made. The

record presents nothing for us to review. [23 C. J. S. 512, sec. 1078.]
A number of assignments of error were based on questions asked witnesses with reference to the feeling existing between appellant and the deceased's wife, and also with reference to the feeling of witnesses toward the defendant and the deceased. It is always proper to show the feeling existing between the parties, or that of a witness against or for the parties. [70 C. J. 950, sec. 1152.]

The wife of appellant testified and was cross-examined. Error was assigned that she was cross-examined on matters not inquired about on direct examination, partly as to the ill-feeling between deceased and appellant. Appellant's wife testified fully and in detail with reference to all matters within her knowledge regarding the homicide, including threats alleged to have been made by the deceased against her husband and also about the disputes over school questions. It is evident that the cross-examination was justified.

Error was assigned to the action of the trial court in permitting the wife of the deceased to testify as to the family and children of the deceased. Ordinarily such evidence is immaterial and should not be admitted. [State v. Baublits, 324 Mo. 1199, 27 S. W. (2d) 16, l. c. 19.] The point was not preserved for our review, as no objection was made until after the question was answered and the next question asked. But aside from that the school controversy was in evidence. It was disclosed that the deceased's children went to school while appellant's wife was teaching. One of the children was a witness. Under the circumstances appellant is not in a position to complain.

Two assignments of error were based upon the argument of the prosecuting attorney to the jury. The first states that the prosecuting attorney informed the jury that it was his opinion that the defendant was guilty. A prosecutor may not express his private opinion as to the guilt of an accused but may state that he believes the evidence sufficient to sustain a conviction. The record disclosed that the prosecutor made the following statement:

"I want to go over the facts in this case with you gentlemen, and the deductions I make from them.

"I affirm in the presence of this jury, it convinces me at least, that it is the most dastardly act that was ever committed in our county since that was committed—

"Mr. PUFAHL: (Interrupting) I object to that, if the Court please, for the reason that is improper—

"Mr. CROOK: (Interrupting) I say that is a deduction I make from that testimony."

It is clear that the prosecutor's expressed opinion was based entirely upon the evidence and therefore not in violation of the rule. The other assignment states that the prosecutor commented on the fact that appellant failed to deny certain damaging evidence against

him. Appellant testified at length and the prosecutor was therefore justified in commenting on the fact that he failed to explain certain incriminating evidence. [23 C. J. S. 560, sec. 1098 (b); State v. Pierson, 343 Mo. 841, 123 S. W. (2d) 149, l. c. 157 (14).]

 Appellant assigned error to the giving of instructions 1, 2 and 3, being the instructions which submitted the case to the jury on murder in the first and second degrees and manslaughter. Appellant was convicted of murder in the second degree. Appellant's assignment of error as to this instruction reads as follows:

". . . because said instruction is improper and erroneous in this, that it purports to be an instruction on murder in the second degree and purports to cover the whole case on murder in the second degree but omits and fails to instruct the jury that if the shooting and killing by the defendant was in self-defense that the jury should acquit the defendant."

The instruction on murder in the second degree reads in part as follows:

" 'Murder in the second degree is the killing of a human being wilfully, premeditatedly and with malice aforethought, but without deliberation.

" 'Bearing in mind the definitions heretofore given the terms "wilfully," "premeditatedly" and "with malice aforethought," if you find and believe from the evidence, beyond a reasonable doubt, . . .' "

The definition of the term "malice" as referred to reads as follows:

" ' ' "Malice," in its legal sense, and as used in these instructions, does not mean mere spite, ill-will, hatred or dislike, as it is ordinarily understood, but it means that condition of the mind which prompts a person to intentionally take the life of another without just cause, justification or excuse, and signifies a state of disposition which shows a heart regardless of social duty and fatally bent on mischief. "Malice aforethought" means malice with premeditation.' "

The court gave a separate instruction on self-defense. No complaint was made that it was not adequate and complete. Note a portion of this instruction:

" 'Upon the law of self-defense, the jury are instructed that if the defendant, at the time he shot the deceased, had reasonable cause to apprehend, and did apprehend, that the deceased was about to either kill him or do him some great bodily harm, and that the danger of his doing either was imminent, and that the defendant shot to avert such apprehended danger, then such shooting was justifiable and you should acquit on the ground of self-defense.' "

As we interpret the instructions they fully presented the issues made for the jury to decide. Note that the instruction on murder in the second degree expressly referred the jury to the definitions given them of "malice aforethought" and other terms. That defini-

tion informed the jury that malice meant that condition of mind which prompts a person to intentionally take the life of another without justification or excuse. So if the jury found that the defendant took the life of the deceased with malice aforethought then they found he did so without justification. The instruction on self-defense informed the jury that if appellant shot the deceased in self-defense then the shooting was justified. We find therefore that the instruction on murder in the second degree did not omit the plea of self-defense. It is impractical to fully embody all of the issues in one instruction. All of the instructions must be considered collectively in determining whether the issues were fairly submitted. [16 C. J. 1049, sec. 2493.] It is not necessary in this case to invoke the rule that errors in one instruction are cured by other instructions as pointed out in the cases of State v. Nasello, 325 Mo. 442, l. c. 461, 30 S. W. (2d) 132, l. c. 138 (16), and State v. Glass, 318 Mo. 611, 300 S. W. 691, l. c. 694, where this court said:

"Instructions must be considered as a whole, and it is for the convenience of considering them that they are separately numbered, and not that such separate numbering gives a different effect. The rule in civil cases ought to apply: That an instruction covering the whole case, and authorizing a verdict without reference to a defense which there is evidence to support, is error, but it is cured, if another instruction be given embodying that defense."

As we said above that rule need not be invoked here because the instruction on murder in the second degree did, by reference, embody the defense of justifiable homicide. In view of what we have said we need not consider the assignments of error as to the instruction on manslaughter or the instruction on murder in the first degree.

Finding no reversible error the judgment is affirmed. *Bohling* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.